IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MICROSOFT CORPORATION,
SAP AG, and SAP AMERICA, INC.,

       Plaintiffs and Counterclaim
       Defendants,

v.

DATATERN, INC.,

       Defendant and Counterclaim
       Plaintiff.

**Consolidated Cases:**
Civil Action No. 1:11-cv-02365-KBF
Civil Action No. 1:11-cv-02648-KBF

(Cases pending in the U.S. District Court for the Southern District of New York)

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF**

Date:   July 16, 2012

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

TABLE OF ABBREVIATIONS ............................................................................................... iv

I.   THE '402 PATENT ......................................................................................................... 1

   A.   Plaintiffs' claim construction methodology is sound, and the doctrine of claim differentiation is inapplicable ................................................................................ 1

   B.   The patent specification describes unclaimed technology, which does not involve logical tables, normalization, or normalized relational schema objects ................. 3

   C.   "Logical table" must result from a normalization process and contain data .......... 4

   D.   The "logical primary key column" must contain values that must be unique ........ 5

   E.   "Normalized relational schema object" requires a normalization process, and designating a primary key is not a normalization process ...................................... 5

II.  THE '502 PATENT ......................................................................................................... 6

   A.   Object model underlies the implementation of an object oriented application ...... 6

   B.   Code generation is required "to create at least one interface object" ..................... 7

   C.   Interface objects are "not part of nor generated by" the application ...................... 8

   D.   The jury is entitled to know how interface objects are "associated with" objects that are in turn "associated with" object oriented applications ............................... 9

   E.   The jury and public is entitled to rely on the same definition of "runtime engine" that the patent examiner relied on in allowing the claims .................................... 10

## **TABLE OF AUTHORITIES**

### CASES

*Advanced Fiber Techs. Trust v. J&L Fiber Services, Inc.*,
   674 F.3d 1365 (Fed. Cir. 2012)..........................................................................9, 10

*Aerotel, Ltd. v. Telco Group, Inc.*,
   2010 U.S. Dist. LEXIS 47266 (S.D.N.Y. May 12, 2010) ......................................1, 4

*Andersen Corp. v. Fiber Composites*,
   474 F.3d 1361 (Fed. Cir. 2007)....................................................................................3

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
   216 F.3d 1042 (Fed. Cir. 2000)....................................................................................7

*Bell Atlantic Network Servs. v. Covad Commc'ns Group*,
   262 F.3d 1258 (Fed. Cir. 2001)..................................................................................10

*Broadcom Corp. v. SiRF Tech.*,
   2010 U.S. Dist. LEXIS 144167 (C.D. Cal. Sept. 3, 2010).............................................7

*Computer Docking Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008)....................................................................................9

*E-Pass Techs., Inc. v. 3COM Corp.*,
   473 F.3d 1213 (Fed. Cir 2007).....................................................................................8

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 3020 (2011) ......................2

*Kumar v. Ovonic Battery Co.*,
   351 F.3d 1364 (Fed. Cir. 2003)....................................................................................7

*Loral Fairchild v. Sony Corp.*,
   181 F.3d 1313 (Fed. Cir. 1999)....................................................................................8

*Mantech Environ. Corp. v. Hudson Environ. Servs.*,
   152 F.3d 1368 (Fed. Cir. 1998)....................................................................................8

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
   415 F.3d 1335 (Fed. Cir. 2005)....................................................................................9

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
   529 F.3d 1364 (Fed. Cir. 2008)....................................................................................3

*Total Containment, Inc. v. Environ Prods.*,
   1997 U.S. App. LEXIS 793 (Fed. Cir. Jan. 17, 1997).............................................6, 7

*VLT, Inc. v. Artesyn Techs., Inc.*,
    103 Fed. Appx. 356 (Fed. Cir. 2004) ......................................................................................... 2

*Zapmedia Servs. v. Apple, Inc.*,
    2010 U.S. Dist. LEXIS 144482 (E.D. Tex. Aug. 19, 2010) ........................................................ 2

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| DataTern | DataTern, Inc., defendant-counterclaim plaintiff |
| FireStar | FireStar Software, Inc. |
| Microsoft | Microsoft, Inc., plaintiff-counterclaim defendant |
| Plaintiffs | Microsoft Inc., SAP AG, and SAP America, Inc. |
| SAP | SAP AG and SAP America, Inc., plaintiffs-counterclaim defendants |
| '502 patent | U.S. Patent No. 6,101,502, titled "Object Model Mapping and Runtime Engine for Employing Relational Database with Object Oriented Software" |
| '402 patent | U.S. Patent No. 5,937,402, titled "System for Enabling Access to a Relational Database from an Object Oriented Program" |
| 1998 O*I manual | Ontos*Integrator Concepts and Capabilities Manual, printed in September 1998 (DT027102-027279) |
| PTO | United States Patent and Trademark Office |
| Hosking | Expert Declaration of Dr. Antony Hosking in Support of Plaintiffs' Opening Claim Construction Brief, filed May 11, 2012, dkt. # 91 |
| Gupta | Declaration of Neeraj Gupta in Support of DataTern's Claim Construction Brief, filed May 11, 2012, dkt. # 88-2 |
| JCCS | Joint Claim Construction and Prehearing Statement, filed May 11, 2012, dkt. # 92 |
| Pltfs.' Open. Br. | Plaintiffs' Opening Claim Construction Brief, filed May 11, 2012, dkt. # 89 |
| DT Open. Br. | DataTern, Inc.'s Opening Claim Construction Brief, filed May 11, 2012, dkt. # 88 |
| Pltfs.' Resp. Br. | Plaintiffs' Responsive Claim Construction Brief, filed July 2, 2012, dkt. # 98 |
| DT Resp. Br. | DataTern, Inc.'s Responsive Claim Construction Brief, filed July 2, 2012, dkt. # 102 |

DataTern's proposed constructions should be rejected, and Plaintiffs' constructions adopted, for the reasons set forth below.

## I.   THE '402 PATENT

### A.   Plaintiffs' claim construction methodology is sound, and the doctrine of claim differentiation is inapplicable

DataTern contends that "Plaintiffs consistently ignore the claim wording and begin their arguments instead with examples" from the intrinsic record. (DT Resp. Br. at 1). To the contrary, Plaintiffs' methodology always starts with the wording of the claims, is not based on mere "examples," and is consistent with the entire intrinsic record and sound legal precedent.

In construing "normalized relational schema object representing the logical table," Plaintiffs analyzed the ordinary technical meaning of the phrase's constituent words – "object," "relational schema," "normalized," and "representing the logical table" – and confirmed that the specification used each of these words consistent with their ordinary technical meaning. (Pltfs.' Open. Br. at 28-33). The result of this analysis is reflected in Plaintiffs' construction.

Likewise, for "logical primary key column," Plaintiffs construction is based on the ordinary technical meaning of "primary key" and also the specification's description of the phrase (which is consistent with the ordinary technical meaning). (Pltfs.' Open. Br. at 36-37).

As for "logical table," it is undisputed that this phrase carries no ordinary technical meaning outside of the '402 patent. (Ex. SS, Gupta tr. 95:19-21). And the claims themselves provide no explicit definition. Therefore, the construction of "logical table" cannot begin with the words of the claim but rather requires reliance on the specification. *See Aerotel, Ltd. v. Telco Group, Inc.*, 2010 U.S. Dist. LEXIS 47266, *39 (S.D.N.Y. May 12, 2010) ("Claim 1 is silent about where the special exchange is located, and no party has suggested that the term has an ordinary and customary meaning. The term therefore must be interpreted consistently with the

meaning the specification ascribes to it."). The intrinsic record defines "logical table" as a "new table" created from a "normalization process" and even states that this "new table" is "henceforth referred to as a 'logical table'" '402 patent, col. 4, ll. 29-34; *see also VLT, Inc. v. Artesyn Techs., Inc.*, 103 Fed. Appx. 356, 363 (Fed. Cir. 2004) (patentee acted as own lexicographer in stating "converter in that class is *referred to as* a 'single ended forward' converter'; thus, court construed "single ended forward converter" to be a converter of the stated class) (emphasis added); *Zapmedia Servs. v. Apple, Inc.*, 2010 U.S. Dist. LEXIS 144482, *14 (E.D. Tex. Aug. 19, 2010) (patentee acted as own lexicographer in stating "this functionality is *hereinafter referred to as* the virtual media asset library") (emphasis added), *affirmed*, 2012 U.S. App. LEXIS 8273 (Fed. Cir. Apr. 25, 2012). Furthermore, even if this definition and the remainder of the specification that consistently links "logical table" to a "normalization process" are ignored, the prosecution history unmistakably and unequivocally disclaims any table created through any process other than normalization. (Pltfs.' Open. Br. at 31-32; Pltfs.' Resp. Br. at 3).

Finally, for the steps of "designating one column of the logical table as a logical primary key column" and "generating" one or more object classes, Plaintiffs' constructions are dictated by explicit disclaimers in the specification and prosecution history. (Pltfs.' Open. Br. at 37-40).

DataTern also argues that the claim-differentiation doctrine compels its construction of independent claim 1 given the language of dependent claims 2 and 5. But claim differentiation does not apply, as none of the claims would be redundant under Plaintiffs' construction. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 3020 (2011) (claim differentiation presumes difference in scope between separate claims only when absence of such difference in scope would make one of the claims entirely redundant). As to claim 5, the physical tables of claim 1 can be either non-normal when first

2

created, or the result of a denormalization process, and claim 5 merely limits the physical tables of claim 1 to the latter (*i.e.*, a "denormalized" physical table that results from a denormalization process). As to claim 2, Plaintiffs already addressed DataTern's specious argument. (Pltfs.' Resp. Br. at 4-6). In any event, claim differentiation cannot be invoked to broaden the meaning of a claim term beyond the correct scope established by the intrinsic record. *Andersen Corp. v. Fiber Composites*, 474 F.3d 1361, 1370 (Fed. Cir. 2007).

### B. The patent specification describes unclaimed technology, which does not involve logical tables, normalization, or normalized relational schema objects

DataTern argues that Plaintiffs' constructions are wrong because, if adopted, the claims would not cover technology disclosed in the specification. (DT Resp. Br. at 2-3, 6-8, 9-10, 13, 16, 17). But just because additional technology is disclosed in the specification – here creating object classes directly from the captured relational schema objects without logical tables and normalization – does not mandate that every claim be construed to cover it. *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("[T]he mere fact that there is an alternative embodiment disclosed in the '828 patent that is not encompassed by district court's claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence.").

In fact, DataTern's expert admitted that the specification discloses unclaimed technology. (Ex. SS, Gupta tr. 105:9-12). While each **claim** requires a "logical table," the expert admitted that the specification discloses an embodiment that does not require a "logical table." (*Id*.). The unclaimed technology is disclosed in figures 1-4 and column 2, line 44 to column 4, line 8 of the specification. These passages never mention normalization or logical tables, but instead describe creating relational schema objects (not to be confused with the claimed "normalized" relational schema objects) directly after performing a process that captures relational-database schema.

3

In contrast, the specification describes the claimed embodiment, from column 4, line 9 through the end of the written description. The claimed embodiment also involves capturing schema from a relational database, but includes the step of normalizing the schema to define logical tables before creating relational schema objects:

> The integrator normalization process provides **new means to create new integrator Relational Schema Objects from existing captured tables, instead of from the database** as is done in the capture process. Once a denormalized table … is captured from a database, the **normalization process allows the user to define different tables** using subsets of the [physical] table .... This **new table is hence a subset of a real physical table in the database and is henceforth referred to as a logical table**. ('402 patent at 4:25-40; *see also* figure 5).

Furthermore, contrary to DataTern's assertions (DT Resp. Br. at 2-3, 4, 6, 17-8), the patent nowhere describes defining logical tables without first performing normalization or relational schema objects being "normalized" when no normalization has been performed. (Pltfs.' Open. Br. at 34-35; Pltfs.' Resp. Br. at 6).

### C. "Logical table" must result from a normalization process and contain data

Consistent with Plaintiffs' construction, the intrinsic record requires that a "logical table" be confined to a table that results from normalization. ('402 patent at 4:25-40; figure 5). DataTern contends, however, that Plaintiffs' construction "ignores the plain wording of the claims" and the "Court may not rewrite the claim or add limitations where they do not appear." (DT Resp. Br. at 11-12). But DataTern ignores the undisputed fact that "logical table" has no ordinary meaning outside the '402 patent – as DataTern's own expert concedes (Ex. SS, Gupta tr. 95:12-21) – and the Court must therefore look to the intrinsic evidence to determine its meaning. *Aerotel,* 2010 U.S. Dist. LEXIS 47266, at *39.

Further, common sense dictates that a "logical table" must be a "table" that contains data. DataTern persists in its argument that the word "table" in the phrase "logical table" does not carry its ordinary technical meaning and that the patent redefined this well-established term to

4

mean a "representation" that does not include any data at all. (DT Resp. Br. at 14). The patent nowhere supports this assertion. The specification specifically requires that "logical tables" be "utilized like a relational table," which contains data. ('402 patent, Abstract & col. 1:47-50).

### D.   The "logical primary key column" must contain values that must be unique

Building on the alleged redefinition of "table," DataTern asserts that the patent redefined the well-established "primary key" phrase in "logical primary key column" to encompass columns having no data values at all. (DT Resp. Br. at 13-14). But this contention contradicts even DataTern's proposed construction, which requires at least one value. *Id.* ("Column of a logical table associated with *a* logical primary key *value*...."). And in any event, the patent nowhere redefines this well-understood phrase that DataTern's expert admitted guarantees uniqueness of the values in each row of one or more columns. (Ex. SS, Gupta tr. 69:21-70:4).

### E.   "Normalized relational schema object" requires a normalization process, and designating a primary key is not a normalization process

"Normalized" means having undergone a normalization process, and DataTern's attempts to escape this intuitive construction all fail. DataTern asserts that "normalized" is "an adjective that distinguishes a form having a designated primary key from a form that does not." (DT Resp. Br. at 7, 9). But the patent nowhere suggests that normalized tables are created by designating primary keys in denormalized tables. Indeed, intrinsic evidence shows, and DataTern's expert admits, that denormalized tables themselves can have primary keys. Ex. TT, 07/24/1998 Office Action, at p. 4 ("the primary key … in a denormalized table is used to access data in a relational database"); Ex. SS, Gupta tr. 77:7-78:4 (primary key can be designated on table with "null" field); *id.* at 61:15-19, 90:9-15 (table with null field is denormalized); Ex. UU, Gupta dep. ex. 8.

Pointedly ignoring its own repeated reminders that the Court must focus on claim language, DataTern glosses over the word "normalized" in the "normalized relational schema

5

object" phrase, contending that the proper construction does not require completion of any normalization process. (DT Resp. Br. at 17). But a "normalized relational schema object" is not a coined term and has no meaning apart from its constituent words. (Pltfs.' Resp. Br. at 7-8). The past-tense word "normalized" means the completed performance of a normalization process.

## II.   THE '502 PATENT

### A.   Object model underlies the implementation of an object oriented application

Plaintiffs' construction defines the "object model" according to its well-understood meaning in the object oriented programming field. DataTern's responsive brief challenges only one aspect of Plaintiffs' construction, that the object model "underlies the implementation of the object oriented software application." Each of DataTern's attacks fails.

*First*, DataTern argues that the object model need not be connected to the object oriented application because it can be "created apart" from and "may exist outside" the application. (DT Resp. Br. at 23-24). This is a red-herring, as nothing in Plaintiffs' construction concerns **how** the object model is created or **where** it exists. (Pltfs.' Resp. Br. at 20-22). Plaintiffs' construction simply captures the necessary reality that the object model must be a model **of** the application, not of some other entity. In contrast, DataTern's construction would sweep in any "template with a predetermined standardized structure" – a tax form, a parking ticket, even a stencil.

*Second*, DataTern asserts a claim differentiation argument based on claim 39, which references "an object model corresponding to the object oriented software application." Notably, claim 39 was **not** in the issued patent but was added nine years later in reexamination. (Ex. N, 6/3/2009 Office Action Response, at p. 8). In such circumstances, courts – including the Federal Circuit – have rejected use of a reexamination claim for differentiation when it would "broaden the reach" of an original claim. *Total Containment, Inc. v. Environ Prods.*, 1997 U.S. App. LEXIS 793, at *5 (Fed. Cir. Jan. 17, 1997). "To permit the use of claims added during

6

reexamination for that purpose would invite manipulation of the reexamination process." *Id.* at *5; *Broadcom Corp. v. SiRF Tech.*, 2010 U.S. Dist. LEXIS 144167, at *20-21 (C.D. Cal. Sept. 3, 2010) (claims "added during reexamination are not an appropriate guide").

*Third*, DataTern argues that the Court cannot consider the definition of "object model" in the prior-art Henninger patent. The law is otherwise. A court **can** use prior art to "assist in ascertaining the meaning of a term to a person skilled in the art." *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1044-45 (Fed. Cir. 2000). Indeed, Henninger was discussed at length during reexamination, making it part of the intrinsic record. *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

### B. Code generation is required "to create at least one interface object"

The parties dispute whether "creat[ing] at least one interface object" requires that code be generated for an interface object class. The surrounding claim language is fatal to DataTern's position that code generation is not required. The claims do not merely recite creating an interface object – they require "**employing the map** to create at least one interface object." And importantly, the specification teaches only one way in which a map is employed to create an interface object – it is used by a "**code generator** … to **generate** interface objects" (col. 2:31-34 & fig. 1), which are later referred to as "**generated** implementation classes" (col. 6:10-12).

In response, DataTern asks the Court to effectively delete the "employing the map" language from this limitation entirely, by reading the claim so as to allow an interface object to be created (in the sense of being instantiated from a class) before the map even exists. According to DataTern, "it is not necessarily required that the system first generate the map and then instantiate the interface objects from the classes." (DT Resp. Br. at 27-28). As a matter of simple logic and grammar, this argument fails under the Federal Circuit "order of steps" law discussed below.

7

Claim 1 recites "employing **the map** to create at least one interface object," teaching that "the map" must exist, because how else could it be used to create an interface object? Indeed, in the immediately preceding limitation, claim 1 explicitly recites creation of the map – "generating a map of at least some relationships between schema in the database and the selected object model." This order of steps – generating a map and then using it to create an interface object – cannot be avoided. Because "the language of most of the steps of [the] method claim refer to the completed results of the prior step, [patentee] must show that all of those steps were performed **in order**." *E-Pass Techs., Inc. v. 3COM Corp.*, 473 F.3d 1213, 1222 (Fed. Cir 2007) (emphasis added); *see also Mantech Environ. Corp. v. Hudson Environ. Servs.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998) (introducing acetic acid through a well could not be performed before providing the well); *Loral Fairchild v. Sony Corp.*, 181 F.3d 1313, 1321 (Fed. Cir. 1999) (aligning barrier with "the insulation layer" could not be performed before "forming a first insulation layer").

DataTern also suggests that Plaintiffs are introducing a distinction between "design time" and "run time" processes that does not appear in the patent. (DT Resp. Br. at p. 27). To the contrary, the distinction between "Design Time" and "Run Time" is abundantly clear in the December 1997 application, which is expressly incorporated into the specification (col. 1:8-15):

> The architecture is divided into two sub-architectures: the Design Time Architecture and the Run Time Architecture. The **Design Time Architecture** involves capturing the object model and database schema, defining a mapping, and then generating output that is passed to the runtime. The **Run Time Architecture** uses the generated COM components and the Design Time mapping information for optimally retrieving information from the database as well as updating the information… (Ex. E at p. 2; *see* pp. 3-5, emphasis added).

### C. Interface objects are "not part of nor generated by" the application

DataTern cannot dispute Plaintiffs' construction of interface objects as "not part of nor generated by" the application because it adopted this construction during prosecution. During reexamination, DataTern attempted to distinguish its claims from the Periwal patent by arguing

8

that Periwal employed a different type of object than the '502 patent's "interface objects." According to DataTern, Periwal employs "user objects," which are "**generated in** the object oriented software application" – as opposed to the '502 patent's "interface objects," which "are **not part of nor generated by** the object oriented software application." Indeed, DataTern cautioned that the two "are not to be confused":

> The [Periwal] user objects are not to be confused with the interface objects recited in claim 1 of the present patent, which interface objects are not part of nor generated by the object oriented software application. (Ex. M at pp. 10-11).

DataTern argues that this clear and unmistakable disclaimer can be ignored because it was only a "single statement." (DT Resp. Br. at 29). The Federal Circuit, however, has repeatedly found disclaimer based on one statement. *Advanced Fiber Techs. Trust v. J&L Fiber Services, Inc.*, 674 F.3d 1365, 1370, 1376 (Fed. Cir. 2012). DataTern also argues its disclaimer must be overlooked because it additionally argued to the PTO that Periwal was not prior art. But even if applicants "distinguished their invention from the prior art in multiple ways," the Federal Circuit has found disclaimers can lie "in a single distinction among many" – just as here. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1377 (Fed. Cir. 2008). Finally, DataTern contends its disclaimer cannot be clear because figure 7 shows an interface object "generated by" an object of the application. But even if that disclosure were present, prosecution disclaimer trumps any broader disclosure in the specification. *Advanced Fiber*, 674 F.3d at 1376; *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005).

> **D.    The jury is entitled to know how interface objects are "associated with" objects that are in turn "associated with" object oriented applications**

DataTern's responsive brief offers no construction of this confusing claim limitation, with its repeated "associated with" language. Instead, it argues that there is no linguistic "hook" in the claim language for interpretation. (DT Resp. Br. at 30). To the contrary, construction is

9

required due to the facially unclear and amorphous "associated with" language, which explicitly invites interpretation to clarify what association is required. *Bell Atlantic Network Servs. v. Covad Commc'ns Group*, 262 F.3d 1258, 1269-70 (Fed. Cir. 2001) ("[O]rdinary meaning of the non-technical term 'mode' is sufficiently broad and amorphous that the scope of the claim [] can be reconciled only with recourse to the written description."); *see also* Pltfs.' Resp. Br. at 31-32.

DataTern incorrectly asserts that Plaintiffs have no evidence supporting the construction that "an interface object class is generated for each object model class." (DT Resp. Br. at 31). But Plaintiffs' opening brief (pp. 19-20) repeatedly cites and quotes the intrinsic record, including the December 1997 provisional (Ex. E. at p. 12-15). Pages 12 and 14-15 of the application, for example, explain that "[f]or any given class in the object model, the product generates two types of classes," one of which contains an "interface" that is "generated by our product based on the attributes and associations of the class in the object model."

### E. The jury and public is entitled to rely on the same definition of "runtime engine" that the patent examiner relied on in allowing the claims

DataTern asks this Court to ignore the definition of "runtime engine" upon which the patent examiner relied in allowing the claims. Instead, DataTern encourages the Court to adopt a wholly different construction, one that encompasses the disclaimed "runtime environment." (Pltfs.' Resp. Br. at 35-38). But the public has been on notice of the meaning of "runtime engine" at least since the Notice of Allowance; DataTern cannot now broaden its meaning to recapture surrendered subject matter. *See Advanced Fiber Techs.*, 674 F.3d at 1376. Further, DataTern incorrectly states that, during prosecution, the "patent owner certainly did not endorse [the] definition" adopted by the examiner. (DT Resp. Br. at 33). To the contrary, DataTern specifically told the examiner that it had no disagreement with the examiner's reliance on the definition or assertion that the definition supported its expert's affidavit. (Ex. O at p. 6).

10

Date: July 16, 2012

Respectfully submitted,

Timothy Edward DeMasi
(tim.demasi@weil.com)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue, 25th Fl.
New York, NY 10153
Tel. (212) 735-4566

Edward R. Reines (*pro hac vice*)
(edward.reines@weil.com)
Evan N. Budaj (*pro hac vice*)
(evan.budaj@weil.com)
**WEIL, GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel. (650) 802-3000

Doug W. McClellan (*pro hac vice*)
(doug.mcclellan@weil.com)
**WEIL, GOTSHAL & MANGES LLP**
700 Louisiana, Suite 1600
Houston, Texas  77002
Tel. (713) 546 5313

*Counsel for Plaintiffs SAP AG and SAP America, Inc.*

Steven Rocci (*pro hac vice*)
(rocci@woodcock.com)
Aleksander J. Goranin (*pro hac vice*)
(agoranin@woodcock.com)
Daniel J. Goettle (*pro hac vice*)
(dgoettle@woodcock.com)
Erich M. Falke (*pro hac vice*)
(efalke@woodcock.com)
**WOODCOCK WASHBURN LLP**
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104
Tel. (215) 568-3100

*Counsel for Plaintiffs Microsoft Corporation, SAP AG, and SAP America, Inc.*

Danielle L. Rose
(danielle.rose@kobrekim.com)
Michael S. Kim
(michael.kim@kobrekim.com)
Megha Charalambides
(megha.charalambides@kobrekim.com)
**KOBRE & KIM LLP**
800 Third Avenue
New York, NY  10022
Tel. (212) 488-1200

*Counsel for Plaintiffs Microsoft Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICROSOFT CORPORATION, SAP AG, and SAP AMERICA, INC., <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> DATATERN, INC., <br><br> Defendant and Counterclaim Plaintiff. | **Consolidated Cases:** <br> Civil Action No. 1:11-cv-02365-KBF <br> Civil Action No. 1:11-cv-02648-KBF <br><br> (Cases pending in the U.S. District Court for the Southern District of New York) |

## CERTIFICATE OF SERVICE

I, Larry E. LaBella, hereby certify that on July 16, 2012, I caused a true and correct copy of the foregoing PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF to be served by means of the Court's CM/ECF System on the following counsel for Defendant DataTern:

**Lee Carl Bromberg**
McCarter & English, LLP (MA)
265 Franklin Street
Boston, MA 02110
(617) 449-6500
Fax: (617) 607-9200

Dated: July 16, 2012         By: /s/ Larry E. Labella
                                 Larry E. LaBella, Paralegal